UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PDT ORIGINAL DESIGNS, LLC, | Case No. 4:17-cv-00315-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| HANGEMRIGHT.COM, LLC, | |
| Defendant. | |

## I. INTRODUCTION

The Court held a *Markman* hearing on August 2, 2018, to interpret the claims of Plaintiff PDT Original Designs, LLC's ("PDT") utility patent (United States Patent No. 8,915,382 ("'382 patent")). The Court's interpretation is set forth below.

## II. BACKGROUND

### A. Procedural Background

On August 2, 2017, PDT filed suit against Defendant HangEmRight.com LLC ("HangEmRight"). In this action, PDT seeks damages and a permanent injunction against HangEmRight for infringement of its '382 patent. PDT alleges that HangEmRight sells products which are protected by one or more claims and designs in the '382 patent.

HangEmRight denies infringement. The Court now engages in the first step of the two-part infringement analysis: claim construction.

## B. Patent at Issue

The sole patent at issue in this case is the '382 patent. The '382 patent discloses "an apparatus and system . . . for supporting a ski on a support structure. The apparatus includes a ski support member, a spacer, and a coupling element." Dkt. 35-1, *abstract*. In layman's terms, the '382 patent covers devices (similar to a small nob, hook, or hanger) upon which a person can hang a single ski[1] in a vertical, upright, position for storage purposes. Storing a ski in this manner keeps the skis off the ground—thus avoiding unwanted damage. PDT's patented method for hanging skis also requires less space than storing skis horizontally.

## III. LEGAL STANDARD

The Court begins with the first step of the two-step infringement analysis—determining the scope and meaning of the patent claims at issue. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The construction of a patent is a question of law for the Court to decide. *Id.*; *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir.

---

[1] The Court uses "single ski" to describe how the ski is hung, but skis could be hung either individually or together as a pair. If hung together, the first ski is hung on the device and the second ski is attached to the first ski, back to back, with each ski's brakes holding the other together. Even if that is the case—that a pair of skis is hung on a single support—still only one ski physically engages with the device itself.

2008) ("When the parties present a fundamental dispute regarding the scope of a claim

term, it is the court's duty to resolve it."). At the same time, the Court is not required to

construe every limitation present in a patent's asserted claims. *O2 Micro Int'l Ltd*, 521

F.3d at 1359. "In some cases, the ordinary meaning of claim language . . . may be readily

apparent even to lay judges, and claim construction in such cases involves little more

than the application of the widely accepted meaning of commonly understood words."

*Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc).

To interpret the claims, the Court must look first to the intrinsic evidence of

record, i.e., the patent itself, including the claims, the specification and, if in evidence, the

prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

Cir. 1996). Such intrinsic evidence is the most significant source of the legally operative

meaning of disputed claim language. *Id.*

In evaluating the intrinsic evidence, the Court examines first the words of the

claims themselves, both asserted and nonasserted, to define the scope of the patented

invention. *Id.* Although words in a claim are generally given their ordinary and

customary meaning, a patentee may choose to be his own lexicographer and use terms in

a manner other than their ordinary meaning, so long as the special definition of the term

is clearly stated in the patent specification or file history. *Id.*

Intrinsic evidence also includes the prosecution history of the patent, if in

evidence, which includes the complete record of all proceedings before the Patent and

Trademark Office (PTO), including any express representations made by the applicant

regarding the scope of the claims. As such, the record before the PTO is often of critical

significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein. *Id.*

In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence.

## IV. ANALYSIS

PDT's patent protects the designs of various apparatuses for hanging skis in a vertical position. At issue here is the language of the preamble, five phrases that appear in each claim, and four phrases from independent claims. The Court will address each in turn.

1. The Preamble

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| the ski having a binder toe piece and a binder heel piece coupled to a deck surface of the ski, the binder toe piece having a boot retention flange extending parallel to the deck surface of the ski, wherein the deck surface and the boot retention flange define a receiving space for receiving a toe end of a ski boot | Limiting as it adds meaning to the shape and sizing of the elements discussed throughout the claims; a ski has a binder toe piece and binder heel piece, which are attached to surface of a ski; the binder toe piece receives the toe region of the ski boot and is formed by the binding flange and the deck of the ski | Not limiting as to structure of the apparatus as the skis and bindings are not claimed; meaning a separate binding toe piece and a binding heel piece attached to the top surface of a ski; means the toe section of a ski binding in conjunction with the ski forming generally a U-shape; this is standard on a pair of downhill ski bindings likely does not need defining; meaning a ski can be hung on the device by the toe binding |

In the '382 patent, each of the asserted independent claims (1, 12, and 17) contain the following preamble:

> [a]n apparatus for supporting a ski on a support structure, the ski having a binder tow piece and a binder heel piece coupled to a deck surface of the ski, the binder tow piece having a boot retention flange extending parallel to the deck surface of the ski, wherein the deck surface and boot retention flange define a receiving space for receiving a toe end of a ski boot . . ..

Dkt. 35-1, Claim 1, 12, 17. While both sides agree that the preamble is referring to a common ski, PDT asserts that the preamble is limiting as it discusses subsequent elements, while HangEmRight argues that the preamble does not limit the claims.

"Generally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, the preamble may be limiting "when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention." *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). If the preamble is "necessary to give life, meaning and vitality" to the claim, then the claim preamble should be construed as limiting. *Kropa v. Robie*, 187 F.2d 150, 152 (CCPA 1951). This is determined "on the facts of each case in view of the claimed invention as a whole." *In re Stencel*, 828 F.2d 751, 754 (Fed. Cir. 1987); *see also Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572–73 (Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation . . . is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.").

One way that a preamble can be limiting is when the preamble provides an antecedent basis for the ensuing claim terms. *Metabolite Labs., Inc. v. Corp. of Am. Holdings*, 370 F.3d 1354, 1358-62 (Fed. Cir. 2004). Antecedent basis occurs when a term in the preamble is essential to understanding the limitation or term in the body of the claim. *Id.*

PDT asserts that the reoccurring use of the word "the"[2] in the body of the claims is a sign that the preamble is providing antecedent basis as these references are to explanations (of objects or designs) laid out in the preamble. Additionally, PDT points to the Examiner's reasons for allowance and his references to these terms when he explained the differences between this patent and other patents. *See* Dkt. 35-5, at 14-15.

For its part, HangEmRight asserts that the preamble is not limiting because the ski, the binder toe piece, and the other descriptions relative to the ski have no bearing on the invention itself (i.e. they are not part of the invention) but are only recited for context. HangEmRight asserts that the '382 patent claims a device that is positioned between the ski and the ski binder toe piece, but that it does not specifically reference a ski. According to HangEmRight, a person could hang anything from the hook and all the language specific to skis is not limiting because it is not a necessary part of the invention. The Court disagrees.

While various items *could* potentially be hung from the devices of the '382 patent, the whole purpose of the invention is to "support[] a ski on a support structure." Dkt. 35-1, *abstract.* Explaining the various pieces of a ski is not just helpful, or an example of what could be hung; it is the whole purpose of the '382 patent. The language of the preamble is limiting as it gives meaning to the various claims, defines their scope, and aids third-parties in understanding the parameters of the claimed inventions.

---

[2] For example, Claim 1 utilizes: "*the* binder tow piece," "*the* receiving space," "*the* boot retention flange," "*the* deck surface," and "*the* ski."

For these reasons, the Court accepts PDT's proposed construction and reads the preamble in claims 1, 12, and 17 as limiting.

2. "A ski support member"

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| A ski support member | The part of the apparatus for supporting a ski with dimensions and an overall shape intended to engage and support a ski | The part of the apparatus for supporting a ski and separate element from the spacer and the coupling element |

Each of the asserted claims requires a "ski support member." The parties agree that this is the part of the design that physically supports the ski, or upon which the ski physically rests (the piece depicted as 206 below). However, the parties dispute whether the ski support member must be designed with an overall shape intended to engage and support a ski and whether the ski support member must be a separate element from the spacer and coupling mechanism. The Court will analyze both arguments.



| Figure 2 from the '382 Patent | Excerpt from Figure 5 from the '382 Patent |
|---|---|

A. Dimensions and overall shape

PDT argues that the ski support member must be shaped in such a way as to engage and support a ski. In other words, the ski support member's shape should match the interior of the ski binding's shape—similar to a ball going into a joint—and complement each other. HangEmRight asserts that shape is not an essential element and anything that holds up a ski will suffice.

In support of its proposed construction, PDT references the specifications of the '382 patent and the various references to how the ski support piece "engages the binder toe piece,"[3] is "positioned within the receiving space,"[4] and is placed in that location as to "prevent[] rotation of the ski."[5]

HangEmRight contends that the shape of the ski support piece is irrelevant, that it simply must be positioned within the receiving space (between the toe binder piece and the heel binder piece), and should hold the ski vertical to qualify. It appears that PDT agrees with this assertion. PDT is not claiming that the ski support member must be contoured to match the ski binder exactly (arguably it could have done this—after all, PDT does use phrases such as "having a contour *that matches* a contour of the receiving space" in other claims of the '382 patent), but simply that it must have an overall shape to engage and support the ski. HangEmRight also contends that Figure 11 of the '382 patent contradicts PDT's proposed construction as it is simply a round nob.

---

[3] Dkt 34-1, at 5:30-31; 7:62-65.

[4] Dkt. 34-1, at 5:29-30; 7:13-14.

[5] Dkt. 34-1, at 7:26.





FIG. 11                    Close up view of Fig. 11

In light of Figure 11, HangEmRight contends that any functional language is superfluous and that the ski support member is anything that can be positioned within the receiving space. PDT reiterates that the support member should be—at least—similar in shape to better engage and hold the ski upright.

While it is true that the patent is devoid of words or phrases indicating that this support member should be shaped to fit a ski, that is the whole point of the invention. Like the preamble, HangEmRight's construction obliviates the phrases in the '382 patent to the point that they have no meaning at all. It is true that arguably anything *could* hold up a ski if it fit in the space between the bindings, but that is beyond the point. This is not a design patent where the drawings control, but rather a utility patent that describes an outcome or process, i.e., holding up skis. The ski support member must do that: support a ski so that it does not fall. Accordingly, some shaping is necessary. An object shaped larger or smaller than the space—or shaped contrary to the receiving space—could result in the ski falling off the hook. This outcome defeats the purpose of the invention. Furthermore, while HangEmRight claims that an exact shape is unnecessary, PDT's

definition does not require an exact shape either, but rather that the piece has "an overall shape intended to engage and support a ski."

B.  Separate element

HangEmRight contends that the ski support member is a separate element from the spacer and coupling element. While it is true that some of the claims visually appear to have three separate elements—and the specifications specifically note that the embodiment depicts separate components—the specifications also outline that "one of skill in the art will recognize that in certain embodiment the ski support member [] and the spacer [] may be a single unitarily molded component." Dkt. 35-1, 6:11-15. Therefore, while some preferred embodiments of the '382 patent are comprised of three separate and distinct physical elements, this is not a limiting factor that the Court will inject into the claim language.

In conclusion, the Court finds that interpreting the ski support member as meaning "the part of the apparatus for supporting a ski with dimensions and an overall shape intended to engage and support a ski" is in line with the patent's intended purpose.

Furthermore, while there are instances where the ski support member is separate from the spacer and coupling elements, the '382 patent also covers a single unit structure. The Court will therefore *not* read the ski support member as necessarily being a separate physical element. The Court adopts PDT's proposed construction.

The next two claims are described in Independent Claims 1 and 12, go hand in hand, and require some preliminary explanation relevant to both disputed claims.

The '382 patent describes the ski apparatus as "comprising" a ski support member.[6] In turn, the '382 patent describes the ski support member as comprising "a ski engaging portion and a binder engaging portion."[7] The ski engaging portion is defined as "having a substantially flat surface engageable with at least one of the deck surface of the ski and an element disposed on the deck surface of the ski to maintain the ski in a desirable orientation"[8] while the binder engaging portion is defined as having "a first surface positioned opposite a second surface with an end surface extending between the first surface and the second surface."[9] In both instances, the parties seem to agree that this is a three-dimensional shape made up of two surfaces—a front and a back—with a piece that connects the two surfaces—i.e. the top. However, HangEmRight again asserts that various elements must be separate.

Because this concept is slightly confusing, the Court will utilize the following excerpt from Figure 4 of the '382 patent. The "first surface" is depicted as 408; the "second surface" is depicted as 410; the "ski engaging portion" is depicted as 404; and the "binder engaging portion" is depicted as 406. PDT asserts that there can be overlap in the descriptions and the elements. HangEmRight disagrees.

_____

[6] Dkt. 34-1, at 14:61.

[7] *Id.* at 14:61-62.

[8] *Id.* at 15:4-8.

[9] *Id.* at 14:63-66.



Excerpt from Figure 4 from the '382 Patent

3. "Ski engaging portion"

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Ski engaging portion having a substantially flat surface engageable with at least one of the deck surface of the ski and an element disposed on the deck surface of the ski to maintain the ski in a desirable orientation | A structurally flat surface that [abuts] either the deck surface of the ski or an element (*i.e.* stomp plate) positioned on the deck surface of the ski where the contact between the surfaces maintains the ski in a static [and vertical orientation] | Flat surface lacking rounded sections or projections independent from the first surface positioned opposite a second surface with an end surface extending between the first surface and the second surface, touches a ski when the ski is mounted via a binding |

Here, the Court notes that the parties proposed constructions for ski engaging portion are not wholly inapposite—at least as to general shape and purpose—except that HangEmRight asserts that the ski engaging portion must be separate from any first and second surface. In other words, HangEmRight suggests that the portion of the invention that actually engages with the ski must be separate from the front of the ski support member.

First, there is nothing to suggest—in this case or broadly speaking—that a single physical element cannot serve a dual purpose. Second, there is nothing to suggest that is

actually what is occurring in this case. The intrinsic evidence in this case supports the idea that elements can overlap. The ski support member, of necessity, must engage a ski. The fact that the ski support member's front surface and the "ski engaging portion" are the same physical structure is not incongruent with the specifications of the patent itself.[10]

Critically, the ski support member is said to have a ski engaging *portion*. In other words, while the word "comprising" appears—at least to HangEmRight—to lead to the conclusion that the elements must be separate, the word "portion" lends credence to the idea that the ski support member is made up of "portions"—one of which is the ski engaging portion. In other words, as shown in Figure 4, the flat surface (410) *includes* the ski engaging portion (404).

Finally, one is left to wonder what physical shape HangEmRight's definition would take. If the flat surface is separate from the first and second surface, it would appear that HangEmRight is implying there must be, in essence, a third surface. This concept does not find support in the record.

For these reasons the Court rejects HangEmRight's proposed construction. PDT's construction, however, adds unnecessary language. The ski engaging portion of the ski support member does just that: engages the ski in order to keep it upright. The wording is

---

[10] Importantly, it is not as if PDT is trying to add an element where one does not exist. To use the except from Figure 4, it is clear that the flat surface 410 and the ski engaging portion 404 point to the same surface or plane—i.e. the "front" face of the object.

not difficult to understand and further defining the phrase is unnecessary. The Court will leave this term as written. *See Phillips,* 415 F.3d at 1312.

4. "Binder engaging portion"

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Binder engaging portion of the ski support member including a first surface positioned opposite a second surface with an end surface extending between the first surface and the second surface | A 3-dimensional geometrical shape with two faces [(*i.e.* a front and a back)] that are positioned opposite each other and with one or more common surfaces [(*i.e.* top surface)] joining the two faces | two sides with and an end between, whether square corners or rounded; a hook<br>First surface positioned opposite a second surface with an end surface extending between the first surface and second surface and separate from the ski engaging portion |

The argument here is very similar to the previous disputed term. The parties do not appear to disagree that the element's shape is one consisting of two sides and a top. However, HangEmRight again asserts that the binder engaging portion must be different from the ski engaging portion. HangEmRight's position is that because Claims 1 and 12 specifically state that the ski support member "comprises" a ski engaging portion and a binder engaging portion"—i.e. because each is listed separately—each must be an independent element. HangEmRight contends that "the ski support member cannot have only one portion nor can these portions be the same" and were it so, "Plaintiff's proposed construction would render one or other of the terms 'ski engaging portion' or 'binder engaging portion' meaningless." Dkt. 37, at 24. The Court disagrees.

Here, as before, there is nothing to suggest that a single structure cannot include two separate features. The Court reincorporates the idea of "portions" here. The ski engaging portion and a binder engaging portion make up the ski support member;

however, this listing of the elements in sequence does not mean they must be separate and distinct physical elements. In fact, HangEmRight seems to agree with this concept.

Many of HangEmRight's arguments in this case center around the idea that elements must be separate or independent. HangEmRight clarified at oral argument that this idea of separate does not necessarily mean separate physically—i.e. that you could take the pieces apart and hold them in two hands—but rather that the parts have separate functions and that PDT must point to what those functions are. Admittedly, HangEmRight gave this explanation in response to another disputed claim term, but that exact concept—that parts need not be separate physically, but have separate functions—is how PDT explains the ski engaging portion and the binder engaging portion here, and yet HangEmRight takes issue with that explanation.

Again, using Figure 4 as an example, the flat surface (410) can include both the ski engaging portion (404) and the binder engaging portion (406) as laid out in the plain language of the '382 patent. Simply because each serves a separate and unique purpose, does not mean that they cannot coexist within the same physical design element. The Court, therefore, cannot accept HangEmRight's "separate and independent" argument.

The remainder of HangEmRight's proposed construction—similar to PDT's proposed construction—simply restates the first and second surface concept as two opposite sides with an end in between. This added language is unnecessary. The terms "first surface" and "second surface" are easy enough to understand—restating them as "front and back," or "side one and two" etc., is redundant. Accordingly, the Court rejects

both party's constructions and will leave this disputed phrase as written. *See Phillips*, 415 F.3d at 1312.

5. "Spacer"

| TERM | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Spacer | The part of the apparatus for supporting a ski dimensioned to provide an effective distance between the ski support member and the support structure | An element that holds the ski support member away from whatever surface the apparatus is mounted on and separate from the ski support member and the coupling element |

Next, each of the asserted claims require a "spacer" that is "positioned between the ski support member and the support structure." The spacer's purpose is clear: there must be space between the ski support member (the element upon which the ski rests) and the support structure (the surface upon which the ski support member is mounted—such as a wall) so that the binder toe piece and heel piece have sufficient room to avoid hitting the support structure.

The parties do not seem to dispute that the spacer provides certain space, or distance, between the ski support member and the support structure. HangEmRight's proposed construction, however, again adds that the spacer must be a separate element.

While it is true that the word spacer is listed separately from the ski support member and the coupling piece in the claim, the Court is not convinced that the spacer is truly a "separate element"—at least not in all circumstances.

The claim states that the spacer is "positioned" between the support member and the support structure, but not that it is a separate piece or individual component. In some embodiments this very well may be the case; but, as previously noted, the '382 patent

appears to cover both a "separate elements" design and a "single unit" design.[11] Because the '382 patent covers both designs, there is no reason to exclude the single unit design as HangEmRight suggests.

Because both sides agree that the spacer provides "space," there is no reason to utilize PDT's construction, and because the Court does not find support for the proposition that the spacer is always a separate element, there is no reason to use HangEmRight's construction. Accordingly, the Court rejects both parties proposed constructions and will give the term "spacer" its ordinary and customary meaning. *See Phillips*, 415 F.3d at 1312.

6. "A support structure"

| TERM | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| A support structure | A surface on a board, a wall, a stand, or a post | Any surface on which the apparatus can be mounted--wall, drawer face, door, cabinet face, stand, post, length of wood, |

The final element related to all claims is the support structure. The support structure is what the apparatus attaches to. PDT claims that the support structure must be a wall or something sufficient to hold the weight of a pair of skis. HangEmRight asserts that the support structure can be any surface on which the apparatus could be mounted.

---

[11] "One of skill in the art will recognize that in certain embodiment the ski support member [] and the spacer [] may be a *single unitarily molded component*." Dkt. 35-1, 6:11-15 (emphasis added).

PDT supports its proposed construction with the idea that the support structure is depicted as a "wall" in the figures of the '382 patent, as well as the intrinsic language of the specifications that "one of skill in the art will recognize . . . that the support structure [] may be any other structure capable of support[ing] the weight of a ski or pair of skis." Dkt. 35-1, at 5:24-28.

HangEmRight, on the other hand, asserts that because there is no actual definition in the '382 patent, there is no reason to limit the claim and while a wall is a good possibility, a stand, post, length of wood, or even a door or cabinet face would be acceptable.

Both party's lists include a board, wall, stand, or post and are thus in agreement that these "structures" are acceptable. PDT, however, takes issue specifically with HangEmRight's idea that a cabinet or drawer face could be utilized, asserting that something like that would be too small or too weak to hold the weight of a pair of skis.

The problem with PDT's argument is that there is no context for any of the suggested items—including the structures the parties agree on. The Court can imagine a large cabinet or closet with the apparatus mounted on the door (either on the inside or outside) that would hold the weight of a ski. This, however, is somewhat irrelevant. The question is not necessarily what *could* hold a pair of skis, but how the term "support structure" should be defined within the parameters of the '382 patent and its intended use. The Court is unwilling to list certain examples (as both sides have done) as it will unduly limit the patent and could create further disagreement in the future if either party found an example of another structure not previously listed. The function or purpose of the

support structure, however, is to adequately support the ski support member with skis attached. This is a more appropriate definition.

Accordingly, the Court rejects both sides proposed constructions that identify specific examples and interprets "support structure" as "any surface or structure capable of supporting the weight of a ski or pair of skis."

The Court next moves to the phrases within specific claims of the '382 patent that are in dispute.

7/8. Contour that matches the contour of the receiving space[12]

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Contoured to match a contour of the receiving space / matches a contour of the receiving space | Having a similar size, shape, and curvature | Anything with two sides and an end that can be positioned within the receiving space |

Claims 5, 11, and 18 describe either an "end surface" or a "substantially rigid loop" that is "contoured to match . . . the receiving space." PDT postures that this inherently means the apparatus must be similar in size, shape, and curvature in order to "match the contours" of the receiving space. HangEmRight asserts that this phrase simply means anything that fits within the receiving space.

In support of its position, PDT looks again to phrases within the specifications that explain (for example) that the "end surface [] of the binder engagement portion [] is *contoured* to match a *contour* of . . . the end surface [] of the receiving space [] [such that

---

[12] These two phrases were originally two separate disputes; however, because they are so closely related, the parties addressed them in tandem. The Court will follow this pattern.

the] engagement . . . operates to limit lateral movement of the ski . . . [and] also operation to limit rotation of the ski . . . [to] prevent[] tipping of the ski . . . from side to side." Dkt. 35-1, 8:49-59 (emphasis added).

HangEmRight contends that PDT is adding more to the claim than was originally intended. While this may be true, HangEmRight does the same thing—just with different words.

HangEmRight asserts that because empty space cannot have a "contour," the Court should define this phrase to allow anything that would fit well within the receiving space—regardless of general shape and size. This misses the mark for multiple reasons. First, as already noted, HangEmRight's definition in this area does not clarify the claims, but rather opens the phrases up to almost unlimited possibilities. The purpose of claim construction is to define terms so that a jury can determine whether infringement has occurred. Broadening the definitions as suggested could have the opposite effect.

Second, there is nothing in the intrinsic, or extrinsic, record to support the proposition that these terms were meant to mean that anything that can fit in the receiving space should be allowed. HangEmRight's entire argument on this topic is devoid of any citations, examples, or evidence to support its proposed construction.

Third, HangEmRight has not proffered anything in support of its proposition that the receiving space cannot have a contour. As PDT points out, contour means "shaped to fit the outline or form of something." *See "Contour"*, THE AM. HERITAGE DICTIONARY (2018). In this case, it seems apparent that the receiving space must have "contour"—i.e. a

general outline or shape—vis-à-vis the shape of the ski that is placed upon it, otherwise the ski would fall off.

HangEmRight's proffered definition of anything with two sides and an end that can fit into the receiving space is far too vague. The only way the ski binding can meaningfully engage with the ski support member is if it has a similar design. However, there is no reason to explicitly list size, shape, and curvature—as PDT suggests—as that is what "contour" means. In other words, PDT's proposed construction doesn't necessarily *define* the phrase is question, it just states it differently.[13] Furthermore, trying to define "contour" with specific examples may backfire and add more confusion than just using the word "contour" itself. The Court will give the phrases in question their plain and ordinary meaning without further definition. *See Phillips,* 415 F.3d at 1312.

9. "Contact bumper positioned between the deck surface"

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Contact bumper positioned between the deck surface of the ski and the substantially flat surface of the ski engaging portions of the ski support member | A element that extends outwardly [(*i.e.* forwardly)] from the surface of the [substantially flat surface] that is sized to make contact with the deck surface of the ski or an element (*i.e.* stomp plate) positioned on the deck surface | A separate and independent element attached (coupled) to the flat surface |

This disputed phrase is found solely in Claims 9 and 10 which discloses a "contact bumper positioned between the deck surface of the ski and the substantially flat surface

---

[13] The Court is not trying to mince words: saying something differently—particularly in a way that adds clarity—could be seen as defining. The Court is simply saying that in this case, there is no reason to do either (define or elaborate) as the word "contour" is readily understandable.

of the ski engaging portion of the ski support member." Dkt. 35-1, 15:57-60. The purpose of this bumper—somewhat similar to the spacer—is to position the ski in such a way as to avoid interference between the toe and heel binder pieces and the ski support structure. The sole dispute here is whether the bumper is a separate and independent element that is attached, or coupled, to the flat surface of the ski support structure, or if it is a single molded unit. The bumper is illustrated below as figure 910.



HangEmRight relies on PDT's use of the word "coupled"—or similar iterations—throughout the '382 patent for its assertion that the bumper is a separate element: "[a]ccording to some implementations, a contact bumper is *positioned* between the deck surface of the ski and the substantially flat surface of the ski engaging portion of the ski support member";[14] "[i]n one embodiment, a contact bumper is *coupled* to the ski

_____

[14] Dkt. 35-1, 3:1-4.

engaging portion . . .";[15] "in other embodiments, contact bumpers are *positioned* on the ski support members between the deck surface of the ski and the ski support member. . .";[16] "in certain embodiments, a contact bumper is *coupled* to the spacer . . .";[17] "[i]n certain embodiments, coupling elements *couple* the contact bumpers and the ski support members to the spacer";[18] "[i]n certain embodiments, a coupling element *couples* the ski support member to the spacer. A second coupling element *couples* the contact bumper to the spacer."[19]

In light of these references, it does appear that the contact bumper is not contemplated in each and every claim. Additionally, unlike the spacer—where there were phrases indicating that it could be either a separate or molded unit—there are no such phrases that reference the bumper. However, this cuts both ways. While there are no phrases confirming the bumper could be attached as a separate feature or molded as one, there are also no phrases confirming that it couldn't. Furthermore, while the definition of "coupled" and "positioned" could further be debated as to whether or not one is more consistent with being a separate element or not, this is of little consequence to the court.

---

[15] *Id.* at 11:5–11.

[16] *Id.* at 13:23–30.

[17] *Id.* at 13:24–29.

[18] *Id.* 13:39-41

[19] *Id.* at 14:1-4.

At oral argument, HangEmRight admitted that its original definition was too narrow and that the word "positioned" should be used instead of attached or coupled.

Even with this admission, the question of whether the bumper is "positioned" as a separate element remains. Frankly, the language of the '382 patent is inconclusive and without clear evidence that this piece must be a separate unit, the Court is hesitant to accept HangEmRight's strict definition of this disputed claim.

Finally, PDT's definition provides a nice explanation of the bumper's purpose, but it does not necessarily resolve the dispute.[20] The Court rejects this construction as well.

In sum, the Court will leave the "contact bumper" phrase as written. There is no conclusive evidence to support the theory that the bumper must *always* be a separate unit. While the word "coupled" does seem to have an air of disconnectedness, the same cannot necessarily be said of the word "positioned," which could mean that the bumper is positioned—or attached—as a separate "add-on" feature or that the ski support member and the bumper are a single molded unit with different portions "positioned" in certain ways and for certain purposes. While the Court's definition—or lack thereof—may leave open the question of whether the bumper is a separate element, such a conclusion does not appear to contradict the specifications of the '382 patent itself. Moreover, as both

---

[20] PDT elaborates on how the bumper extends from the flat surface and where it is positioned and how it is shaped, however, HangEmRight does not appear to disagree with the general shape or purpose of the bumper, only whether it is a separate element or not.

sides agree the word "positioned" is best, the Court will simply leave the phrase as written. *See Phillips,* 415 F.3d at 1312.

10. "Ski support member comprises a substantially rigid loop having a contour"

| PHRASE | PDT'S PROPOSED CONSTRUCTION | HANGEMRIGHT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Ski support member comprises a substantially rigid loop having a contour that matches a contour of the receiving space | A curved symmetrical structure spanning an opening that resists deformation under the weight of a ski [having a similar size, shape, and curvature][22] | Rigid loop projecting upward from and separate from the flat surface |

The final disputed phrase is similar to claims 7 and 8 as it relates to contouring. Claim 11 discloses a "ski support member compris[ing] a substantially rigid loop having a contour that matches a contour of the receiving space." Dkt. 35-1, at 15:66 - 16:2. As with the previous claims regarding contours, PDT simply asks the Court to define the claim as having a similar size, shape, and curvature. In this case, HangEmRight does not seem to dispute the curvature argument, but insists that the rigid loop must be separate from the flat surface.

PDT asserts that neither the claims themselves, nor the specifications, indicate that the substantially rigid loop must be separate from the substantially flat surface of the ski engaging portion. This is true—the patent never states either way whether the rigid loop is separate from, or overlapping with, the flat surface that engages the ski. In support of its proposition, PDT references figure 10 which shows that the two embodiments can overlap.

In certain embodiments, the *ski support member 1002 comprises a substantially rigid loop* having a contour that matches a contour of the receiving space 120 within the binder toe piece 110 such that the ski support member 1002 is matingly receivable within the receiving space 120. In one

embodiment, *the ski engaging portion 1004 of the support member 1002 is substantially flat* to engage the deck surface 104 of the ski 102. . .

Dkt. 35-1, 11:36-43 (emphases added).



In light of this non-restrictive language, the Court cannot find support for HangEmRight's proposed construction that the rigid loop must be separate from the flat surface. Nonetheless, there is also no reason to add the description suggested by PDT. The additional language—particularly about the structure itself ("spanning an opening that resists deformation under the weight of a ski")—adds more substance to the claim rather than clarifying what is already written.

As the Court noted with respect to claims 7 and 8, the word "contour" is not difficult to understand—in fact it means "shaped to fit"—and adequately describes the shape of the loop. Further defining of this term is unnecessary. The Court elects to leave the claim as written.

# V. ORDER

The Court construes the disputed claims as follows:

1.      Preamble – Limiting.

2.      Ski support member – "The part of the apparatus for supporting a ski with dimensions and an overall shape intended to engage and support a ski."

3.      Ski engaging portion – as written in the patent.

4.      Binder engaging portion – as written in the patent.

5.      Spacer – as written in the patent.

6.      Support structure – "any surface or structure capable of supporting the weight of a ski or pair of skis.".

7./8.   Contour phrases – as written in the patent.

9.      Contact bumper – as written in the patent.

10.     Rigid loop – as written in the patent.

DATED: September 11, 2018

David C. Nye
U.S. District Court Judge